# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOT ERIC PINKERTON, | CV F   03-6061 DLB HC |
|           Petitioner, | ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
|    v. | |
| M. YARBOROUGH, Warden, | [Doc. 8] |
|           Respondent. | |

_____/

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.   (Court Docs. 3, 15, 19.)

## PROCEDURAL BACKGROUND

On November 18, 1999, Petitioner was convicted in the Kern County Superior Court of assault with a deadly weapon (Ca. Pen. Code § 245 (a)(1), and battery resulting in the infliction of great bodily injury (Ca. Pen. Code § 243(d).  (CT 161.)  The jury further found that Petitioner personally used a deadly weapon in the commission of the offenses (Ca. Pen. Code § 12022(b)(1)), and that he had suffered three prior serious felony convictions (Ca. Pen. Code §§ 667(a)-(I), and 1170.12), and three prior prison terms (Ca. Pen. Code § 667.5(b)).  (CT 161.)  Petitioner was sentenced to thirty-three years to life in prison.

///

///

1      Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth

2  Appellate District.  On August 6, 2001, the Court of Appeal affirmed the judgment.

3  (Respondent's Exhibit A, attached to Answer.)

4      Petitioner filed a petition for review in the California Supreme Court, which was denied

5  on October 10, 2001.  (Respondent's Exhibit B, attached to Answer.)

6      On October 10, 2001, Petitioner filed a petition for writ of habeas corpus in the California

7  Supreme Court.  The petition was denied on July 9, 2003.  (Respondent's Exhibit C, attached to

8  Answer.)

9      On July 25, 2002, Petitioner filed a petition for writ of habeas corpus with the Kern

10  County Superior Court.  (Respondent's Exhibit D, attached to Answer.)  The petition was denied

11  on August 13, 2002.  (Id.)

12      Petitioner filed the instant federal petition for writ of habeas corpus on August 7, 2003.

13  By order of November 3, 2003, Petitioner filed an amended petition on December 5, 2003.

14      Respondent filed an answer on July 8, 2004, and Petitioner filed a traverse on August 11,

15  2004.

16                              STATEMENT OF FACTS[1]

17      On September 8, 1997, a concert was held at Stramler Park in Bakersfield,
    which featured "Social Distortion," an alternative rock group, and several other
18  bands.  The concert started at approximately 3:00 p.m. and ended around 8:00
    p.m.  Shawn Cope worked at the refreshment stand and sold tickets to the
19  audience for beer and soft drinks.  The refreshment stand continued to serve
    beverages after the concert ended.  Michelle Richardson and Shawn McCormick
20  attended the concert, and drank two beers each.
        After the concert ended, several fights broke out among the crowd.  One of
21  Richardson's friends, Cheryl, found Richardson and McCormick, and said that
    she thought she was going to get into a fight.  Richardson left with Cheryl, and
22  they approached three or four women who appeared to be skinheads.  Richardson
    told the women, "[C]ome on, we've all had a good time here, we've been
23  drinking, just let it go."  Richardson testified that one person in the skinhead
    group was named Eva, and had purplish-red hair and tattoos.  Eva agreed they did
24  not want to fight, and the group started to break up.  However, Lori Morelock
    arrived at the scene and insulted Eva.  Morelock, who was Cheryl's friend, walked
25  over to Eva, called her a bitch, and hit her in the face.
        After Morelock insulted Eva, a fight broke out among the women.

26

27      _____

        [1] The Court finds the Court of Appeal correctly summarized the facts in its August 6, 2001, opinion.
28  (Respondent's Exhibit A, attached to Answer.)  Thus, the Court adopts the factual recitations set forth by the
    California Court of Appeal, Fifth Appellate District.

                                            2

Richardson attempted to get away, but another woman approached and was about to throw sand in her face. Richardson punched this woman in the face, and Cheryl was fighting with the other women.

Shawn McCormick described the fight as a "huge brawl," and the "type of thing you see in a bar on TV." McCormick saw several women yelling and hitting each other, and Richardson and Cheryl were in the middle of the fight. Shawn Cope thought there were 15 to 20 people involved in the fight, including Richardson. Cope watched as some of Richardson's friends tried to pull her away.

Michelle Richardson finally emerged from the crowd and found Shawn McCormick, and said they should get out of there. They decided to leave the park and walk downtown. McCormick believed the fight had ended, although there were still people yelling and shouting.

As the fight ended, a man and a woman approached McCormick and Richardson. McCormick described a man as six feet tall, with long brown hair that was pulled back in a ponytail. He had a goatee, some tattoos, a pierced lower lip, and wore a long, black T-shirt and knee-length jean shorts. McCormick did not know the woman, but heard someone call her "Eva." McCormick recognized the woman as being involved in the fight with Richardson and Cheryl.

Stephanie Gamblin was also in the area and saw a man walking near the scene of the fight. The man held his arm down by his leg, and held a knife which was pointed upwards. The man was looking around to see if anyone was looking at him. Gamblin described the man as about six feet one inch tall, with long hair in a ponytail. His eyes looked as if he had been drinking or used a lot of drugs. He wore longer shorts and a dark T-shirt. Gamblin was unable to identify anyone as the man who was carrying the knife.

Shawn McCormick testified that the woman pointed to Richardson, and the man asked the woman, "[I]s that the bitch?" The woman nodded and replied, "[Y]es, that's her." Shawn McCormick told them that everything was okay and the fight was over. Shawn McCormick turned toward Richardson and saw the man put his arm around her.

Shawn Cope also saw the man place his arm around Richardson. Cope thought the man was trying to console her, but he did not recognize the man as one of their friends. The man had long hair and wore shorts and a dark T-shirt. He was thin, with facial hair and a tattoo, and was about six feet two inches tall. Cope suddenly realized the man was holding a metal object, and watched as the man stabbed Richardson in the back.

As Richardson was speaking with McCormick, she felt someone bump her, as if she was kicked in the lower back. Richardson turned and looked at a man who was standing behind her, and she told McCormick the man had just kicked her. Richardson testified the man had long hair in a ponytail, and wore a dark T-shirt and long jean shorts. The man looked at Richardson, and put something in his pocket as he walked away. Richardson realized she had a sharp pain in her back, and felt something going down her back and leg. She put her hand behind her back, and it was covered with blood. Richardson realized she was bleeding heavily and she fell down.

The man and woman walked away after the stabbing. McCormick screamed for help and tried to grab the man, but he ran away and she was unable to stop him. Cope also chased the man but he was unable to catch the suspect.

At approximately 10:00 p.m., Bakersfield Police Officer Kelly Caldwell responded to Stramler Park on the dispatch about a large fight at the concert. She found Michelle Richardson lying on the grass with her back and clothing saturated with blood. The paramedics treated Richardson at the scene, and she was transported to the hospital. Richardson suffered a puncture wound along the right side of her spine, in the lower back area. The stab wound penetrated the muscle

of her lower back, but did not rupture the bowel area.

Officer Caldwell interviewed Shawn Cope and Shawn McCormick at the scene. McCormick described the suspect as six feet tall, with long brown hair in a ponytail, a goatee, a pierced lower lip, and wearing a black T-shirt. McCormick also described Eva, the woman with red hair who was involved in the fight with Richardson. Shawn Cope described the suspect as six feet two, thin build, dark hair in a long ponytail, and wearing jean shorts and a dark T-shirt.

A large group of Michelle Richardson's friends went to the hospital and waited for her to be treated in the emergency room. Shawn McCormick had spoken to the organizers of the concert, and learned the suspects name might be Scot Pinkerton. When Officer Caldwell arrived at the hospital, McCormick said that she had additional information and Scot Pinkerton might be the suspect. Officer Caldwell spoke with the other individuals at the hospital, and one person said that Scot Pinkerton might work at Naked Al's Tattoo Parlor.

Officer Caldwell requested the sheriff's department to prepare a six-person photographic lineup, which included a picture of [Petitioner]. Officer Caldwell separately showed the photographic lineup to Shawn McCormick and Michelle Richardson. Both McCormick and Richardson immediately identified [Petitioner] as the person who stabbed Richardson. Shawn McCormick testified it was '[n]ot hard" to identify [Petitioner], and she was positive that he was the man who stabbed Richardson. McCormick did not speak with Richardson between the time of the stabbing and her observation of the photographic lineup.

Officer Caldwell also showed the photographic lineup to Shawn Cope. Cope selected [Petitioner's] photograph and identified him as the suspect who stabbed Richardson.

Officer Caldwell was unable to find [Petitioner] either at his residence or at Naked Al's, and no one was able to inform Officer Caldwell about [Petitioner's] whereabouts. [Petitioner] was subsequently located and arrested for the assault on Michelle Richardson.[2]

At trial, Shawn McCormick identified [Petitioner] as the man with the ponytail who stabbed Michelle. Michelle Richardson also identified [Petitioner] as the man who stabbed her. Richardson testified she got a good look at the man when she turned around and they looked at each other. Shawn Cope confirmed the accuracy of his earlier identification from the photographic lineup, but he was unable to identify [Petitioner] at trial as the suspect.

[Petitioner] did not testify at trial, but relied on an alibi defense. Anthony Gardea worked at the park on the night of the concert, and testified that he saw [Petitioner] trying to break up a fight between two girls around 8:00 p.m. A security guard started to beat [Petitioner], and Gardea intervened and escorted [Petitioner] from the park. Gardea testified [Petitioner] drove away in his truck. Gardea testified [Petitioner] wore a white T-shirt and shorts, and his hair was shoulder-length but not in a ponytail.

Patricia Parada testified that she arrived at Naked Al's Tattoo Parlor at approximately 8:45 p.m. that night, and [Petitioner] was already there. [Petitioner] spent two hours placing a tattoo on her ankle. Parada left the store around 10:45 p.m., and [Petitioner] was still there. [Petitioner] was wearing shorts and a white T-shirt.

James Kulstad was [Petitioner's] apprentice at the tattoo parlor, and worked at the store on the evening of the concert. Kulstad testified [Petitioner] worked on Parada's tattoo that evening, and Eva arrived at the store around 10:15 p.m. Eva was covered in blood, and said she had been in a fight. [Petitioner] and

---

[2] According to the probation report, [Petitioner] was arrested in September 1999, nearly two years after the assault.

1

Eva left the store around 10:45 p.m.

2

Both Parada and Kulstad testified that [Petitioner] did not return to the tattoo parlor after that night. Kulstad finally saw him about six months later. Jeremy Suniga also testified that he never saw [Petitioner] at the tattoo parlor after the night of the concert.

3

4

Eva Joezos was [Petitioner's] girlfriend and the mother of his child. She was the woman with red hair who was involved in the fight. Eva testified that she was at the concert with [Petitioner] around 6:00 p.m. Eva was jumped by an unknown girl, and [Petitioner] broke up the fight. The security guards escorted [Petitioner] from the park.

5

6

Eva testified that she was involved in another fight after the concert. A woman asked if Eva had jumped her friend, and whether she was [Petitioner's] girlfriend. Another woman said they should not fight because they had a good time at the concert. Eva asked one of the women whether she was too old to be fighting, and the woman hit her in the face. Eva testified the fight involved eight people and lasted two or three minutes. Eva suffered cuts to the head, a bloody nose, and bruises on her body.

7

8

9

After the fight, Eva went to the tattoo parlor and found [Petitioner] there around 10:15 p.m. She told [Petitioner] about the fight. [Petitioner] used his T-shirt to wipe the blood from Eva's face, and they left the store around 10:45 p.m.

10

11

Eva testified that she moved to Oregon shortly after the concert, and [Petitioner] joined her there. They stayed for several months.

12

[Petitioner] was convicted of assault with a deadly weapon and battery, and received a third strike sentence.

13

(Respondent's Exhibit A, attached to Answer, at 3-8.)

14

## DISCUSSION

15

A.   Jurisdiction

16

17

Relief by way of a petition for writ of habeas corpus extends to a person in custody

18

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

19

or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

20

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered

21

violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises

22

out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28

23

U.S.C. § 2254(a); 2241(d).

24

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

25

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

26

enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), cert. denied, 522 U.S.

27

1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

28

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

        The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

        While habeas corpus relief is an important instrument to assure that individuals are

constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

(1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

factual determinations must be presumed correct, and the federal court must accept all factual

findings made by the state court unless the petitioner can rebut "the presumption of correctness

by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

1   S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

2   110 F.3d 1380, 1388 (9th Cir. 1997).

3   C.      Juror Misconduct

4           Petitioner contends that Juror 3 committed misconduct because she lied regarding her

5   relationship with Petitioner's aunt, Mary Durrett.  (Amd. Pet. at 5.)

6           "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . .

7   trial  . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391

8   U.S. 145 (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the

9   misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United

10  States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974), cert. denied, 419 U.S. 835.  Although it is

11  generally preferred that a trial court hold an evidentiary hearing when allegations of juror

12  misconduct arise, it is not always required, particularly when the court knows the exact scope and

13  nature of the misconduct.  See United States v. Halbert, 712 F.2d 388, 389 (9th Cir.1983); United

14  States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1977); see also United States v. McVeigh, 153

15  F.3d 1166, 1187 (10th Cir.1998), cert. denied, 119 S.Ct. 1148 (1999).  The Court is mindful of

16  the fact that "it is virtually impossible to shield jurors from every contact or influence that might

17  theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983), quoting Smith v.

18  Phillips, 455 U.S. 209, 217 (1982).

19          In order to obtain a new trial on this claim, Petitioner "must first demonstrate that a juror

20  failed to answer honestly a material question on voir dire, and then further show that a correct

21  response would have provided a valid basis for a challenge for cause.  The motives for

22  concealing information may vary, but only those reasons that affect a juror's impartiality can

23  truly be said to affect the fairness of the trial."  McDonough Power Equip., Inc. v. Greenwood,

24  464 U.S. 548, 556 (1984).

25          As stated by the Kern County Superior Court, assuming without deciding that juror

26  misconduct even occurred in this case, it was not of the kind that necessarily showed the juror in

27  question was biased.  Here, Petitioner complains that Juror 3 claimed not to know Durrett well,

28  when in fact the juror regularly socialized with Durrett at prayer meetings, brunches and other

1    activities.  In support of this contention, Petitioner submits notes from a post-trial interview with

2    Juror 3, as well as a declaration from Durrett.  In Durrett's declaration she indicates that she met

3    Juror 3 when Juror 3 joined Durrett's Sunday School class at Valley Baptist Church in 1994.

4    Durrett states that a small group would go to lunch together after church, and Juror 3 started

5    going to lunch with them as well.  Durrett further indicated that many of the class participants

6    would request prayer for different family members and friends.  Durrett declares that Juror 3

7    requested prayer for her estranged husband who had become obsessed with pornography.  Durrett

8    further indicates that she several times requested prayer for petitioner.  (Amd. Pet. at 7,

9    Declaration of Mary Durrett.)

10       Durrett further declared that she discussed her nephew "Scot" with Juror 3, and Durrett

11   informed Juror 3 that he had been in trouble several times.  Id.  Durrett stated:

12       I believe that Jenny Towers (Juror 3) had at least some idea of who Scot was and
         had information about his current charges based upon my prayer requests and
13       detailed discussions at lunch on several occasions after church at the time she was
         seated on the jury.
14

15   Id.  Durrett provides her opinion by stating:

16       I believe that Juror No. 4 [sic], was so disillusioned with her husband over his
         obsessions with pornography and the subsequent ending of her lengthy marriage
17       that she was down on anyone that she perceived as having done anything wrong,
         and that she specifically wanted to sit on this jury for that reason.

18   Id.

19       Nothing in the record suggests any prejudice to Petitioner by the maintenance of Juror #3

20   on the jury, notwithstanding her relationship with Petitioner's aunt.  Juror 3 voluntarily, on her

21   own initiative, disclosed that she knew Petitioner's aunt and regularly attended Sunday School

22   class with her.  She assured the judge that this association would not influence her decision in

23   Petitioner's case and there is no evidence that she did not, in fact, function as a fair and impartial

24   juror.  Further, there is no evidence that Juror 3 deliberately concealed or attempted to deceive

25   the court as to her association with Petitioner's aunt.  As Respondent submits, the record

26   demonstrates that Juror 3 was forthright about the fact that she had seen Durrett on a regular

27   basis.  Juror 3's disclosure therefore did not create an impression that she was only remotely

28   familiar with Durrett, but rather that she was quite familiar with Durrett and had often regularly

8

1   seen Durrett at church.  The trial judge promptly inquired, after disclosure of the association,

2   whether Juror 3 could still be impartial, and Juror 3 replied that it would not influence her.  (RT

3   251.)

4        Petitioner's claim based on Durrett's contention in her declaration that Juror 3 was so

5   disillusioned with her husband that she specifically wanted to sit on Petitioner' s jury so she

6   could convict Petitioner is pure speculation and unsupported by the record.  Conclusory

7   allegations do not warrant habeas relief.  See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir.1995)

8   (holding that conclusory allegations made with no reference to the record or any document do not

9   merit habeas relief).

10       In sum, Juror 3 provided responsive and direct answers to the questions posed to her, she

11  was more than forthcoming with the information, there is no evidence that she intentionally or

12  unintentionally concealed the information, and there is no evidence that she harbored bias or

13  impermissible prejudice during the deliberation process.  The state courts' determination of this

14  issue was not contrary to, or an unreasonable application of, clearly established Supreme Court

15  precedent.

16  D.   Ineffective Assistance of Counsel

17       Petitioner contends that defense counsel was ineffective for failing to inquire into whether

18  one of the jurors was improperly in possession of outside information concerning the facts of the

19  case.  (Amd. Pet. at 5.)

20       In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court

21  must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064

22  (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that

23  counsel's performance was deficient, requiring a showing that counsel made errors so serious that

24  he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland,

25  466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective

26  standard of reasonableness, and must identify counsel's alleged acts or omissions that were not

27  the result of reasonable professional judgment considering the circumstances.  Id. at 688; United

28  States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

1 performance is highly deferential.  A court indulges a strong presumption that counsel's conduct

2 falls within the wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. 668, 687,

3 104 S.Ct. 2052, 2064 (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

4     Second, the petitioner must show that counsel's errors were so egregious as to deprive

5 defendant of a fair trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688.  The court must

6 also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

7 ineffectiveness.  <u>Id</u>.; <u>Quintero-Barraza</u>, 78 F.3d at 1345; <u>United States v. Palomba</u>, 31 F.3d 1356,

8 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

9 was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

10 (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

11 have been different.

12     A court need not determine whether counsel's performance was deficient before

13 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

14 <u>Strickland</u>, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

15 prejudice, any deficiency that does not result in prejudice must necessarily fail.

16     Ineffective assistance of counsel claims are analyzed under the "unreasonable

17 application" prong of <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  <u>Weighall v. Middle</u>, 215 F.3d

18 1058, 1062 (2000).

19     In the midst of Petitioner's trial, Juror 3 informed the court that she recognized a woman

20 that was sitting in the audience next to Petitioner's mother.  The following proceedings then

21 ensued:

22     THE COURT: The record will reflect that all of the jurors have stepped

23 out, except juror number 3.

    And Juror Number 3, I think you indicated to the bailiff, who indicated to

24 me, that, while you folks were outside during my discussion with counsel about a

25 question and an objection, you indicated to the bailiff that you believe you

26 recognize the lady in the audience, who is seated next to a lady that has been sort

of identified as [Petitioner's] mother, am I correct?

27     THE JUROR: Correct.

28     THE COURT: And where is it that you recognize that lady from?

THE JUROR: From church.

THE COURT: Okay.

And how often do you get together in any sort of gathering, where you and she are both present?

THE JUROR: At a Sunday School class, which would be fairly regularly every Sunday morning, until recently.

I moved to a different Sunday School class.

THE COURT: Okay.

Does it make you feel terribly uncomfortable, knowing that this person, who attends the same church, and has been in the same Sunday School class, up until recently, is a person whose [sic] acquainted with the [Petitioner's] mother?

THE JUROR: No.

THE COURT: Okay.

You are not going to allow that to influence your decision in this case, are you?

THE JUROR: No, sir.

THE COURT: You are a person of integrity?

THE JUROR: Yes, sir.

THE COURT: That's why you shared that with us in the first place.

THE JUROR: Yes.

THE COURT: Even though I forgot to tell you that you were supposed to do that, so, am I correct?

THE JUROR: Right.

THE COURT: Okay.

Mr. Lukehart, any questions of Juror Number 3 in this regard?

MR. LUKEHART: No, your Honor.

THE COURT: And, Mr. Woodruff?

MR. WOODRUFF: None, your Honor.

THE COURT: Okay.

Juror Number 3, could I ask you to step outside for just a minute, while I talk with you about counsel, I'm sorry, talk with counsel about you?  I said that wrong.

THE JUROR: Okay.

(Juror leaves the courtroom.)

THE COURT: The record will reflect that she has stepped out.

And, counsel, that's exactly the way it did go down, and that includes the fact that, ordinarily, I do ask these people to let me know, and I did not in this

1  case.

2              Mr. Lukehart, is this of any concern for you?

3              MR. LUKEHART: No, your Honor.

   THE COURT: Mr. Woodruff, for you?

4              MR. WOODRUFF: No, your Honor.

5              THE COURT: All right.  Let's bring the entire jury back in, please, unless

6  Mr. Lukehart, you have an 1118.1, that you wish to just place on the record?

   (RT 250-253.)

7          Juror 3 informed the court that she recognized the woman sitting next to Petitioner's

8  mother in the audience.  The juror advised the court that she had regularly attended Sunday

9  School every Sunday with the woman until just recently, when the juror had changed to a

10 different Sunday School class.  The juror indicated that she would not be uncomfortable serving

11 on the jury knowing that this individual, who was Petitioner's aunt, attended her same church and

12 had regularly been in the same Sunday School class.  Juror 3 assured the court that the

13 association would not influence her decision in the case.  Based on the trial judge's immediately

14 questioning and the juror's remarks, it was reasonable for counsel to not further question this

15 juror.  As there was no indication that this juror would allow the association to Petitioner's aunt

16 influence her decision in the case and she would and could remain impartial notwithstanding this

17 relationship.  (RT 250-252.)  Although Petitioner submits a declaration from his aunt, Ms. Mary

18 Durrett who declares that the relationship was more intimate than described by the juror, even

19 assuming this to be true, Petitioner has not established any resulting prejudice by this alleged

20 association between the two, and counsel therefore was not ineffective for failing to further

21 question the juror.

22         As stated by the Kern County Superior Court[3] in rejecting Petitioner's claim raised in the

23 state habeas corpus petition:

24 ───────────────────

25     [3] Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the Kern County Superior Court, the last state court

26 to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower

27 court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's

28 rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

1             Petitioner's contention fails.  He does not show he was prejudiced by his
2 trial counsel's allegedly deficient representation.  As explained above, assuming
   without deciding that juror misconduct even occurred in this case, it was not of
3 the kind that necessarily showed the juror in question was biased.  Consequently,
   a claim that Petitioner's attorney did not investigate the juror to discover her true
4 relationship with Petitioner's aunt is insufficient.  Something more is needed.
   Some showing, setting forth facts with particularity, is required to explain how or
5 why #3's explanation of her relationship with Petitioner' aunt was indicative of
   bias on her part.  Petitioner makes no such showing.  Also, Petitioner's failure to
6 show he was biased by his trial counsel's allegedly deficient misrepresentation
   and his failure to show that if juror #3 committed misconduct he was not
7 prejudiced by it also decides his ineffective assistance of appellate counsel claim.
   If the claims appellate counsel failed to raise are shown to have no merit, then
8 counsel's representation could not have been deficient for not raising them.

9 (Respondent's Exhibit D, Opinion, at 3.)

10             The state courts' determination of this issue was not contrary to, or an unreasonable

11 application of, clearly established Supreme Court precedent.  Accordingly, the petition for writ of

12 habeas corpus must be denied.

ORDER

13             Based on the foregoing, it is HEREBY ORDERED that:

14      1.       The petition for writ of habeas corpus is DENIED; and

15      2.       The Clerk of Court is directed to enter judgment in favor of Respondent.

16             IT IS SO ORDERED.

17 **Dated:**    **June 13, 2005**            _____ **/s/ Dennis L. Beck** _____
18 3b142a                      UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28